## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| JORIKI USA INC., | Case No. 25-10034 LSS |
| Debtor. | |

**MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING THE TRUSTEE TO ENTER INTO ONE OR MORE STALKING HORSE AGREEMENTS AND TO PROVIDE BIDDING PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (D) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

Alfred T. Giuliano (the "Trustee"), in his capacity as the Chapter 7 Trustee for the estate of Joriki USA, Inc. (the "Debtor"), respectfully represents as follows:

### Relief Requested

1. Pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trustee hereby moves for entry of the following (the "Motion"):

(a) an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**, granting the following relief:

(i) approving the procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), to be used in connection with one or more sales (each, a "Sale Transaction") of substantially all of the Debtor's assets (collectively, the "Assets");

(ii)     authorizing the Trustee to enter into an asset purchase agreement with a "stalking horse" bidder (such agreement, a "<u>Stalking Horse Agreement</u>" and, such bidder, a "<u>Stalking Horse Bidder</u>" and, the bid of any such Stalking Horse Bidder, a "<u>Stalking Horse Bid</u>"), and to provide certain bidding protections, including a Termination Payment (as defined below), to any Stalking Horse Bidder in connection therewith;

(iii)    scheduling (A) an auction of the Assets (as defined below) (the "<u>Auction</u>") on **March 7, 2025**, and (B) a final hearing to consider approval of the proposed sale of Assets (the "<u>Sale Hearing</u>") on **March 14, 2025**, subject to the availability of the Court;

(iv)     approving the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "<u>Sale Notice</u>") and as **Exhibit 3** (the "<u>Auction Notice</u>");

(v)      approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") in connection with any Sale Transaction (the "<u>Assumption and Assignment Procedures</u>");

(vi)     approving the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "<u>Counterparty</u>") of (A) the Trustee's calculation of the amount necessary to cure any defaults under an applicable Contract (the "<u>Cure Costs</u>") and (B) certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale Transaction, substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "<u>Assumption and Assignment Notice</u>") and

(vii)    granting related relief; and

(b)      an order ("<u>Sale Order</u>"), substantially in the form attached hereto as **Exhibit B**, granting the following relief at the Sale Hearing, if any:

(i)      authorizing one or more Sale Transactions for the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Trustee and any Successful Bidder (as defined below), with liens to attach to the proceeds of the applicable Sale Transaction;

(ii)     authorizing the assumption and assignment of certain Contracts in connection with an applicable Sale Transaction; and

(iii)     granting related relief.

**Jurisdiction and Venue**

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

**A.      The Debtor and the Commencement of These Cases**

3.      On January 12, 2025, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      On or about January 14, 2025, the Office of the United States Trustee appointed the Trustee as chapter 7 trustee, which appointment remains in effect [Docket No. 15].

5.      Prior to the Petition Date, the Debtor and its Canadian affiliates operated as a co-packer for some of the largest beverage brands in the world. As part of its business operations, the Debtor provided end-to-end solutions to customers, including bottle blow molding, recipe development support, plant trials, manufacturing, quality inspection, warehousing, and shipping.

6.      On or around August 2024, one of the Debor's affiliate's production facilities was linked to a listeria outbreak, which significantly disrupted operations, resulted in the loss of customers, and ultimately led to the Debtor's liquidity crunch that precipitated the Debtor's bankruptcy filing.

7.     As of the Petition Date, the Debtor's estate consists of various industrial machines, equipment, systems, and bottling accessories (the "Equipment") that are presently located at the Debtor's leased facility in Pittston, PA (the "Pittston Facility"). Further, the Debtor is party to several key contracts with numerous suppliers and customers (the "Executory Contracts", together with the Equipment, the "Assets").

**B.     Marketing Efforts and Sale Process**

8.     Prior to the Petition Date, and following the listeria outbreak, the Debtor, along with its Canadian affiliates, began exploring a potential sale transaction with parties that may have an interest in acquiring the Debtor's assets. The Debtor's engaged Alavarez & Marsal ("A&M"), who served as the Debtor's prepetition investment banker and financial advisor. Upon information and belief, A&M spearheaded a sale process (with the assistance of the Debtor's private equity sponsors), engaging with at least eight (8) interested parties who had executed NDAs and visited the Debtor's virtual data room. Upon further information and belief, the Debtor was unable to consummate a transaction with one of these parties due to time and liquidity constraints.

9.     Since the Trustee's appointment, the Trustee and his professionals have quickly worked to understand the Debtor's business, including the value and market for a potential sale of the Assets.  To that end, the Trustee and his professionals picked up where A&M left off, establishing a new data room, soliciting potential purchasers, entering into non-disclosure agreements with several potential buyers (collectively, the "Interested Parties")—including ten (10) new Interested Parties not previously involved in A&M's process—and regularly communicating with and responding to inquiries from the Interested Parties.  Indeed, a competitive field of potential buyers has emerged, and the Trustee has already received several informal bids from the Interested Parties.

10.     In conjunction with the Motion, the Trustee has reached an agreement in principle with the Debtor's primary prepetition lenders—who hold a blanket first-priority secured lien on substantially all of the Debtor's assets—to fund a sale process through the end of March and provide a return to unsecured creditors.[1] Indeed, the carrying costs associated with maintaining the Pittson Facility are significant, including approximately $350,000 in monthly rent and utility expenses. The longer the sale process takes, the longer the Trustee will continue having to pay these costly administrative expenses. As such, it is the Trustee's business judgment that time is of the essence and that a swift sale of the Assets is likely to result in a higher purchase price and maximize recoveries for the estate and its creditors.

11.     The Trustee is committed to pursuing Stalking Horse Bids as needed. Thus, the Trustee seeks authority to designate Stalking Horse Bidders following entry of the Bidding Procedures Order and enter into a Stalking Horse Agreement after providing notice and holding a hearing, if necessary, in accordance with the Bidding Procedures. Any Stalking Horse Bid would constitute an offer that would ensure the sale of the Assets to a contractually-committed buyer at a price point the Trustee believes to be fair and reasonable and serve as a floor for the price of the Assets at the Auction. If granted, the relief requested herein will position the Trustee to execute and complete a post-petition sale process that will generate the highest or best value for the Assets for the benefit of the Debtor's estate and its economic stakeholders.

12.     In light of these considerations, the Trustee proposed the following timeline:[2]

---

[1] The Trustee anticipates filing a motion to approve a stipulation for the use of cash collateral and to obtain postpetition financing (the "Financing Stipulation") shortly after the filing of this Motion.

[2] Capitalized terms used in this chart but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion.

| KEY DATES AND DEADLINES FOR AUCTION | |
|---|---|
| **Deadline for Trustee to file and serve Sale Notice** | Two business days after entry of the Bidding Procedures Order |
| **Deadline for Trustee to file and serve Assumption and Assignment Notice** | Two business days after entry of the Bidding Procedures Order |
| **Stalking Horse Bidder Designation Deadline** | **February 21, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Bidding Protection Objection Deadline** | Three calendar days after service of the applicable Stalking Horse Notice (as defined below) |
| **Stalking Horse Hearing** | **February 27, 2025**, subject to the availability of the Court. |
| **Sale Objection Deadline for All Assets** | **February 27, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Cure Objection Deadline for All Potentially Assumed Contracts** | **February 27, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Bid Deadline for All Assets** | **February 28, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Auction Notice Deadline** | **March 4, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Auction** | **March 7, 2025**, at 10:00 a.m. (prevailing Eastern Time) either (a) at the offices of Fox Rothschild LLP, 1201 North Market Street, Suite 1200, Wilmington, DE 19801, or (b) virtually. |
| **Deadline for Trustee to file and serve Notice of Auction Results** | **March 10, 2025** |
| **Adequate Assurance and Supplemental Sale Objection Deadlines for Assets** | **March 12, 2025**, at 4:00 p.m. (prevailing Eastern Time) |
| **Sale Hearing** | **March 14, 2025**, subject to the availability of the Court |

13.    The Trustee and his professionals believe that this timeline balances the need to provide adequate notice to parties in interest and efficiently market the Assets (particularly given the significant interest to date as well as A&M's prepetition marketing efforts), with the need to quickly and efficiently consummate a Sale Transaction. Moreover, avoiding a protracted bankruptcy proceeding will result in significant cost-savings to the estate and ultimately provide greater recovery to the Debtor's stakeholders. As set forth in the Bidding Procedures, bidders will have access to information about the Debtor's Assets that will aid parties in developing thoughtful

and competitive bids. As such, the Trustee believes that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

14. The Bidding Procedures and the proposed timeline allow the Trustee to maximize value while minimizing administrative expenses. In view of the foregoing, the Trustee respectfully submits that the Court should grant the relief requested herein, in accordance with the proposed timeline for completing the sale process.

**Stalking Horse Procedures**

15. As of the filing of this Motion, the Trustee is in the process of engaging with a number of parties pursuing a purchase of the Debtor's Assets. Based on the progress the parties have achieved thus far, the Trustee has determined, in his reasonable business judgment, that having the flexibility to designate Stalking Horse Bidders will enhance the Trustee's ability to maximize the value of the Debtor's Assets.

16. Accordingly, as set forth in further detail in Section II of the Bidding Procedures (the "Stalking Horse Procedures"), the Trustee requests authority to enter into a Stalking Horse Agreement with a bidder that the Trustee determines to designate as a Stalking Horse Bidder. The Trustee also requests authority to provide any so- designated Stalking Horse Bidder with certain bidding protections, including a "break-up" fee and an expense reimbursement (together, a "Termination Payment"), if the Trustee determines, in the exercise of his reasonable business judgment, that setting a floor for the Assets is in the best interests of the Debtor's estate. In accordance with the Stalking Horse Procedures, within two business days after executing a Stalking Horse Agreement, the Trustee will file with the Court and serve on the Sale Notice Parties (as defined in Section X.B of the Bidding Procedures) a notice setting forth the material terms of

the proposed Stalking Horse Agreement, including the terms and conditions of any Termination Payment to be provided thereunder (the "Stalking Horse Notice").

17. The Trustee will request that the Court schedule a hearing (the "Stalking Horse Hearing") to be held, subject to the Court's availability, on **February 27, 2025**, to consider approval of any applicable Stalking Horse Agreement and the provision of any Termination Payment to be provided thereunder.

18. Parties in interest that wish to object to the designation of, or provision of a Termination Payment to, a Stalking Horse Bidder will be afforded an opportunity to file with the Court and serve on the applicable Objection Notice Parties (as defined in Section X.D of the Bidding Procedures) an objection (each such objection, a "Bidding Protection Objection") within three calendar days after service of the applicable Stalking Horse Notice. If the parties are unable to consensually resolve a Bidding Protection Objection, such Bidding Protection Objection will be heard and resolved by the Court at the Stalking Horse Hearing. Under the Stalking Horse Procedures, in the absence of any Bidding Protection Objection, the Trustee may file, upon certification of counsel and after consulting with the Consultation Party, a proposed order authorizing and approving the Trustee's entry into the Stalking Horse Agreement and the provision of a Termination Payment thereunder in lieu of holding a Stalking Horse Hearing.

19. Given the urgency of the Trustee's need to maximize value for the Debtor's stakeholders through a timely and efficient sale process, the ability to designate Stalking Horse Bidders and provide bidding protections as proposed herein is justified, appropriate and in the best interests of the Debtor's estate and all parties in interest in this Chapter 7 Case.

## The Proposed Form Sale Order

20. A proposed form Sale Order, substantially in the form attached hereto as **Exhibit B**, will be provided to all Prospective Bidders (as defined in Section IV of the Bidding Procedures).

As set forth in further detail below and in the Bidding Procedures, Prospective Bidders will be required to submit to the Trustee a modified proposed Sale Order, revised to reflect the terms of their respective bids. In accordance with Local Rule 6004-1(b)(iv), the below chart summarizes certain significant terms of the proposed Sale Order:[3]

| MATERIAL TERMS OF THE FORM SALE ORDER | |
|---|---|
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The sale and transfer of the Purchased Assets to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of any of the Contracts, will not subject the Buyer to any liability with respect to the operation of the Debtor's businesses prior to the Closing or by reason of such transfer, except that, upon the Closing, the Buyer shall remain liable for the applicable Assumed Liabilities (as defined in the Asset Purchase Agreement). See Sale Order, ¶¶ K, L, 12-14. |
| **Relief from Bankruptcy Rule 6004(h) Stay**<br>Local Rule 6004-1(b)(iv)(O) | Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 and any applicable Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry. See Sale Order, ¶¶ S, 31. |

## The Bidding Procedures

### A.    Overview

21.    The Bidding Procedures are designed to promote a competitive and expedient Sale Process. If approved, the Bidding Procedures will allow the Trustee to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the Trustee's strategy. As the Bidding Procedures are attached to the Bidding

---

[3] This summary is qualified in its entirety by the provisions of the proposed form Sale Order. To the extent that there is any inconsistency between the terms of the proposed Sale Order and this summary, the terms of the proposed Sale Order shall control. To the extent a particular type of provision identified in Local Rule 6004-1(b)(iv) is not herein summarized, the proposed form Sale Order does not contain a provision of such type or such provision is otherwise inapplicable to the relief requested herein. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the proposed Sale Order, as applicable.

Procedures Order, they are not herein restated in their entirety. Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below:[4]

| MATERIAL TERMS OF THE FORM SALE ORDER | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | Qualified Bid and Qualified Bidder Requirements are set forth in Sections IV, V and VI of the Bidding Procedures.<br><br>A. **Due Diligence** – Execute confidentiality agreement with the Trustee.<br><br>B. **Bid Deadline** – Submit Qualified Bid by **February 28, 2025, at 4:00 p.m. (prevailing Eastern Time)**<br><br>C. **Qualified Bid Requirements**<br><br>   1. <u>Identification of Bidder</u>. A Qualified Bid must fully disclose the legal identity of the bidder and any related parties participating in the bidding and Auction process.<br><br>   2. <u>Purchase Price</u>. A Qualified Bid must (a) identify the Assets to be purchased, including any then-known Contracts that are proposed to be assumed and assigned to the bidder and any liabilities to be assumed and (b) set forth the purchase price of the bid and include the valuation allocated to the applicable Assets included therein.<br><br>   3. <u>Form of Consideration.</u><br><br>     • Credit Bid. A bidder holding a perfected security interest in any of the Assets may seek to credit bid all or a portion of such bidder's claims for its respective collateral (each such bid, a "<u>Credit Bid</u>") in accordance with section 363(k) of the Bankruptcy Code.<br><br>     • All-Cash Offer. Unless a bid includes a Credit Bid, the bid must include a statement confirming that the bid is based on an all-cash offer.<br><br>   4. <u>Minimum Bid for Stalking Horse Assets</u>. A bid for Assets that are the subject of a Stalking Horse Bid (any such Assets, the "<u>Stalking Horse Assets</u>") must either (a)(i) be a bid for all of the Stalking Horse Assets in the Stalking Horse Bid and (ii) exceed the cash purchase price in the Stalking Horse Bid, plus any applicable Termination Payment; or (b) propose an alternative transaction that, in the Trustee's reasonable business judgment, provides higher or better terms than the Stalking Horse Bid, taking into account, among other things, any applicable expense reimbursement.<br><br>The Trustee, in consultation with the Consultation Party, may consider a bid for a portion of any applicable Stalking Horse Assets (each such bid, a "<u>Partial Bid</u>") if (a) the Trustee receives another Partial Bid for the remaining applicable Stalking Horse Assets such that, when taken |

---

[4] This summary is qualified in its entirety by the provisions of the Bidding Procedures. To the extent that there is any inconsistency between the terms of the Bidding Procedures and this summary, the terms of the Bidding Procedures shall control. Capitalized terms used but not defined prior to or in this summary shall have the respective meanings ascribed to such terms later in the Motion or in the Bidding Procedures, as applicable.

together, the Partial Bids constitute a higher or better bid than the Stalking Horse Bid plus any applicable Termination Payment; or (b) the Partial Bid proposes a purchase price for the applicable Stalking Horse Assets that, when taken together with the estimated liquidation value of the remaining applicable Stalking Horse Assets, exceeds the purchase price in the Stalking Horse Bid plus any applicable Termination Payment.

The Trustee, in consultation with the Consultation Party, may consider a bid for a portion, or the entirety, of Assets subject to an applicable Stalking Horse Bid together with other Assets that are not the subject of any Stalking Horse Bid (each such bid, a "Mixed Bid") if the Trustee determines, in his reasonable business judgment, that the Mixed Bid provides more value to the Debtor's estates than the applicable Stalking Horse Bid, taking into account, among other things, the estimated liquidation value of the Assets not the subject of any Stalking Horse Bid, the estimated liquidation value of the remaining Stalking Horse Assets not subject to the Mixed Bid and any applicable Termination Payment.

5. Proposed Asset Purchase Agreement. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid and marked against the form asset purchase agreement provided by the Trustee to Prospective Bidders to reflect the proposed Sale Transaction (each, a "Proposed Asset Purchase Agreement"). A Qualified Bid for Stalking Horse Assets must also include a marked copy of the applicable Stalking Horse Agreement showing the differences between the Stalking Horse Agreement and the Prospective Bidder's Proposed Asset Purchase Agreement.

6. Proposed Sale Order. A Qualified Bid must include a proposed sale order that is based on and marked against the form Sale Order to reflect the proposed Sale Transaction (each, a "Proposed Sale Order"). A Qualified Bid for Stalking Horse Assets must also include a marked copy of any Sale Order included or prepared in connection with any applicable Stalking Horse Bid (each, a "Stalking Horse Sale Order") showing the differences between the Stalking Horse Sale Order and the Prospective Bidder's Proposed Sale Order.

7. Financial Information. A Qualified Bid must include (a) a statement that the Prospective Bidder is financially capable of consummating the proposed Sale Transaction; (b) sufficient evidence to determine that the Prospective Bidder has, or can obtain, the financial wherewithal to consummate the proposed Sale Transaction and (c) Adequate Assurance Information (as defined below).

8. Good Faith Deposit. Each Qualified Bid must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash (or other form acceptable to the Trustee in his sole discretion) in an amount equal to 10% of the cash portion of the proposed purchase price for the applicable Assets (inclusive of any amount thereof comprising any applicable Credit Bid consideration).

9. Adequate Assurance. A Qualified Bid must include evidence of the Prospective Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Trustee

may require (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises included in the bid (collectively, the "<u>Adequate Assurance Information</u>"). All Adequate Assurance Information must be in a form that will permit its immediate dissemination to Counterparties.

10. <u>Representations and Warranties</u>. A Qualified Bid must include a statement that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the applicable Assets prior to submitting its bid; and (b) the Prospective Bidder has relied solely upon its own due diligence in making its bid.

11. <u>Authorization</u>. A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution and delivery of a bid, participation in the Auction and closing the proposed Sale Transaction.

12. <u>Other Requirements</u>. A Qualified Bid must also satisfy, among others (as set forth in Section VI.A.13 of the Bidding Procedures), the following requirements:

- state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the applicable Auction as the next highest or next best bid after the Successful Bid (as defined below) for the applicable Assets (each such bid, a "<u>Backup Bid</u>");

- state that the bid represents a binding, good-faith and bona fide offer to purchase the applicable Assets and is irrevocable (a) until the selection of the Successful Bid; or, (b) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined below);

- state and acknowledge that the Prospective Bidder, unless the Prospective Bidder is the Stalking Horse Bidder, shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the sale process;

- state that the Prospective Bidder is committed to closing the Sales Transactions contemplated in its bid as soon as practicable;

- expressly waive any claim or right, unless you are the Stalking Horse Bidder, to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the applicable Auction or the sale process;

- not contain any financing or due diligence contingencies of any kind;

- state whether the Prospective Bidder intends to offer future employment to any of the Debtor's employees;

- state or estimate the types of transition services, if any, the Prospective Bidder would require of and/or provide to the Debtor;

|  |  |
|---|---|
|  | • certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Trustee; and |
|  | • include a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order |
|  | 13. <u>Discretionary Qualification</u>. Notwithstanding the foregoing requirements, the Trustee, at his own discretion and in accordance with his fiduciary duties and applicable law, may treat any bid received before the Bid Deadline as a Qualified Bid. |
| **Provisions Providing Bid Protections to Stalking Horse or Initial Bidder** Local Rule 6004-1(c)(i)(C) | Section II of the Bidding Procedures sets forth the proposed Stalking Horse Procedures, which, if approved, would govern the Trustee's provision of bidding protections to designated Stalking Horse Bidders. Because the Stalking Horse Procedures are discussed in detail in this Motion, they are not restated in this summary. See supra ¶¶ 15-19. |
|  | In addition, Section VII.B.3 of the Bidding Procedures provides that to the extent that a Baseline Bid (as defined below) is a Stalking Horse Bid, the bidding for the applicable Stalking Horse Assets shall commence at an amount equal to the sum of (i) the purchase price in the Stalking Horse Bid, (ii) the amount of any applicable Termination Payment and (iii) the amount of the applicable Minimum Overbid (as defined below). |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures sets forth the Trustee's reservation of rights to, in his reasonable business judgment, in a manner consistent with his fiduciary duties and applicable law and after consulting with the Consultation Party, modify the Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth therein; adopt new rules and procedures for conducting the bidding and Auction process; if applicable, provide reasonable accommodations to a Stalking Horse Bidder or otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets. |
| **Closing with Alternative Back-up Bidders** Local Rule 6004-1(c)(i)(E) | **Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.** |
|  | Immediately prior to the conclusion of the applicable Auction for an Auction Package (as defined below), the Trustee (in consultation with the Consultation Party) will (a) determine, in a manner consistent with the Bidding Procedures, which Qualified Bid is the Backup Bid for the Auction Package; and (b) notify all Qualified Bidders at the applicable Auction for the Auction Package of the identity of the Backup Bidder for the Auction Package and the amount of the purchase price and other material terms of the Backup Bid. |
|  | A Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of a Sale Transaction with the Successful Bidder for the applicable Auction Package and (b) 60 days after the applicable Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>"). If the Sale Transaction with the applicable Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder for the applicable Auction Package and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the applicable Auction; provided, that, the Trustee may, in his reasonable business judgment |

| | |
|---|---|
| | (after consulting with the Consultation Party and providing notice to the Sale Notice Parties), elect not to pursue the Sale Transaction contemplated by the Backup Bid. The Trustee shall be authorized to consummate the bid of the Backup Bidder without further order of the Court or notice to parties in interest. |
| **Provisions Governing the Auction**<br>Local Rule 6004- 1(c)(ii) | **Section VII of the Bidding Procedures sets forth the procedures governing the Auction(s).**<br><br>If the Trustee receives more than one Qualified Bid for an Asset, the Trustee will conduct an Auction for such Asset. With respect to Assets for which the Trustee receives only one Qualified Bid by the Bid Deadline, the Trustee may, in his reasonable business judgment, and in consultation with the Consultation Party, determine to consummate a Sale Transaction with the applicable Qualified Bidder or include such Assets in the applicable Auction. In the event the Trustee determines not to hold an Auction for some or all of the Assets, the Trustee will file and serve a notice stating that the Auction for such Assets has been canceled and providing all other relevant information to the Sale Notice Parties as required by the Bidding Procedures.<br><br>The "Auction," if required, will be conducted (i) on **March 7, 2025** either (a) at the offices of Fox Rothschild LLP, 1201 North Market Street, Suite 1200, Wilmington, DE 19801, or (b) virtually, or (ii) at such other date, time or location as designated by the Trustee, after consulting with the Consultation Party and providing notice to the Sale Notice Parties.<br><br>A. Participation. Each participant in the Auction must (i) be a Qualified Bidder, (ii) appear at the applicable Auction personally or through a duly authorized representative and (iii) confirm on the record that (A) the participant has not engaged in any collusion with respect to any bid or the sale process and (B) any and all Qualified Bids submitted by the participant constitute good faith, binding and bona fide offers to purchase the applicable Assets.<br><br>B. Proceedings. The Auction proceeding will (i) be transcribed and/or video recorded and (ii) include open bidding in the presence of all Qualified Bidders, subject to reasonable limitations imposed by a virtual auction platform to be evaluated and determined by the Trustee.<br><br>C. Auction Packages. Prior to the commencement of any Auction, the Trustee (in consultation with the Consultation Party) will make a determination regarding the Assets and/or combinations of Assets for which the Trustee will conduct an Auction (each such Asset or group of Assets, an "Auction Package"). The Trustee may determine to include an individual Asset in more than one Auction Package.<br><br>D. Baseline Bids. Prior to the commencement of the applicable Auction, the Trustee will determine, in his reasonable business judgment (and in consultation with the Consultation Party), the highest and/or best Qualified Bid submitted for each Auction Package (each such Qualified Bid, a "Baseline Bid"). Bidding for each Auction Package at the applicable Auction shall commence at the amount of the applicable Baseline Bid.<br><br>E. Minimum Overbids. At each round of bidding for an Auction Package, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round, which initially will be based on and increased from the applicable Baseline Bid. After consulting with the Consultation Party, the Trustee will announce before the Auction the minimum required increments for successive Qualified Bids (each, such bid, a "Minimum Overbid"); provided, that, to the extent that the Baseline Bid |

|   | is a Stalking Horse Bid, the bidding for the applicable Stalking Horse Assets shall commence at an amount equal to the sum of (a) the purchase price in the Stalking Horse Bid, (b) the amount of any applicable Termination Payment; and (c) the amount of the applicable Minimum Overbid (each such bid, a "<u>Stalking Horse Overbid</u>"). The Trustee may, in his reasonable discretion (and in consultation with the Consultation Party), announce increases or reductions to Minimum Overbids or Stalking Horse Overbids at any time during the Auction. |
|---|---|
|   | F.    <u>Leading Bids</u>. After the first round of bidding and between each subsequent round of bidding, the Trustee will announce, in consultation with the Consultation Party, the bid that he believes to be the highest or otherwise best offer for the applicable Auction Package (each such bid, a "<u>Leading Bid</u>") and describe the material terms thereof. |
|   | G.    <u>Successful Bids</u>. Immediately prior to the conclusion of the Auction for an Auction Package, the Trustee, in consultation with the Consultation Party, will (i) determine which Qualified Bid constitutes the highest or otherwise best bid for the Auction Package (each such bid, a "<u>Successful Bid</u>") and (ii) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid for the Auction Package (each such bidder, a "<u>Successful Bidder</u>") and the material terms of the Successful Bid. |
|   | H.    <u>Incremental Deposit Amount</u>. Upon a Qualified Bidder's declaration of a bid at the applicable Auction, the Qualified Bidder must state on the record its commitment to pay following the applicable Auction, if such bid were to be selected as the Successful Bid or as the Backup Bid for the applicable Auction Package, the incremental amount of the Qualified Bidder's Good Faith Deposit calculated based on the increased purchase price of such bid (such Good Faith Deposit so increased, the "<u>Incremental Deposit Amount</u>"). As a condition to remaining the Successful Bidder, the Successful Bidder shall, within two business days after the conclusion of the Auction, wire to the Trustee in immediately available funds the Incremental Deposit Amount, calculated based on the purchase price in the Successful Bid. |

## B.    Sale Noticing and Objection Procedures

22.    The below chart sets forth the noticing and objection procedures and requirements established by the Bidding Procedures (collectively, the "<u>Sale Noticing and Objection Procedures</u>"):

| SALE NOTICING AND OBJECTION PROCEDURES | |
|---|---|
| **Sale Notice** | Two days after the entry of the Bidding Procedures Order, the Trustee will file with the Court and serve on the Sale Notice Parties a notice (the "<u>Sale Notice</u>") setting forth (a) a description of the Assets available for sale in accordance with the Bidding Procedures; (b) the date, time and location of the Auction and Sale Hearing; (c) the Sale Objection Deadline and Supplemental Sale Objection Deadlines (each as defined below) and the procedures for filing such objections; and, if applicable, (d) a summary of the material terms of any Stalking Horse Agreement, including the terms and |

| | |
|---|---|
| | conditions of any Termination Payment to be provided thereunder, as of the date of the Sale Notice. |
| **Sale Objections** | Objections to a sale of the Assets, including any objections to (i) a sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order (each such objection, a "<u>Sale Objection</u>") shall be filed with the Court and served on the Objection Notice Parties by no later than **February 27, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>"). |
| **Stalking Horse Notice** | If applicable, within two business days after executing a Stalking Horse Agreement, the Trustee will file with the Court and serve on the Sale Notice Parties a Stalking Horse Notice containing a summary of the material terms of the applicable Stalking Horse Agreement, including the terms and conditions of any Termination Payment to be provided thereunder. |
| **Bidding Protection Objection** | Bidding Protection Objections must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (ii) filed with the Court; and (iii) served on the applicable Objection Notice Parties by no later than three calendar days after service of the applicable Stalking Horse Notice. |
| **Qualified Bid Selections** | The Trustee will evaluate timely bids, in consultation with the Consultation Party, and will (i) make a determination regarding which bids qualify as Qualified Bids and which Qualified Bids have been selected as Baseline Bids and (ii) notify bidders whether they qualify as Qualified Bidders as soon as commercially reasonable following the Bid Deadline. |
| **Auction Notice** | The Trustee will file with the Court and serve on the Sale Notice Parties a notice (the "<u>Auction Notice</u>") setting forth (i) the date, time and location of the Auction; (ii) the Assets the Trustee intends to sell at the Auction (each such Asset, an "<u>Asset</u>"); and (iii) the date and time of the Sale Hearing on **March 4 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Auction Notice Deadline</u>"). |
| **Auction Results** | On **March 10, 2025**, the Trustee will file with the Court and serve on the Sale Notice Parties a notice of the results of the Auction (the "<u>Notice of Auction Results</u>"), which will (i) identify each Successful Bidder and each Backup Bidder; (ii) include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby and (iii) set forth the Supplemental Sale Objection Deadline (as defined below) and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction. |
| **Supplemental Sale Objections** | Following service of the Notice of Auction Results, Sale Notice Parties may object to the conduct of the Auction and/or the particular terms of any proposed Sale Transaction in a Successful Bid (each such objection, a "<u>Supplemental Sale Objection</u>") by **March 12, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Supplemental Sale Objection Deadline</u>"). |

23.    The Trustee submits that the Sale Noticing and Objection Procedures, coupled with

the Assumption and Assignment Procedures set forth below, constitute adequate and reasonable

notice of the key dates and deadlines and other important information regarding the sale process, including the Objection Deadlines (as defined below), the Bid Deadline and the time and location of the Auctions and Sale Hearings. Accordingly, the Trustee requests that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, approve the form of Auction Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

## C.   Assumption and Assignment Procedures

24.   In connection with any Sale Transaction, the Trustee may seek to have the Debtor assume and assign to a Successful Bidder one or more Contracts. The Assumption and Assignment Procedures are designed to, among other things, govern the Trustee's provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties. The below chart sets forth the Assumption and Assignment Procedures:

| ASSUMPTION AND ASSIGNMENT PROCEDURES | |
|---|---|
| **Assumption and Assignment Notice** | Two business days after the entry of the Bidding Procedures Order, the Trustee will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale Transaction an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Trustee's good-faith calculation of Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). |
| | Cure Objection Deadline. Any Counterparty to a Contract that wishes to object to the Trustee's proposed Cure Costs (each such objection, a "Cure Objection") shall file with the Court and serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by no later than **February 27, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline"). |
| | Resolution of Cure Objections. The Trustee (in consultation with the Consultation Party) and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the applicable Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph. If a Cure Objection is resolved in a manner that is not in the best interests of the Debtor's estate, |

| | |
|---|---|
| | whether or not such resolution occurs prior to or after the closing of the applicable Sale Transaction, the Trustee may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the applicable Sale Transaction (subject to the terms of the applicable Sale Transaction). All other objections to the proposed assumption and assignment of the Debtor's right, title and interest in, to and under a Contract will be heard at the applicable Sale Hearing. |
| | <u>Adjournment</u>. If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the applicable Sale Hearing, or, at the Trustee's option, be adjourned to a subsequent hearing (each such Cure Objection, an "<u>Adjourned Cure Objection</u>"). An Adjourned Cure Objection may be resolved after the closing date of the applicable Sale Transaction. Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Cure Objection shall, as applicable, be deemed assumed and assigned to the applicable Successful Bidder as of the closing date of the applicable Sale Transaction.<br><br><u>Failure to Timely Object</u>. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs. |
| **Adequate Assurance Objections** | <u>Adequate Assurance Objection Deadline</u>. Any Counterparty to a Contract proposed to be assumed by and assigned to a Successful Bidder at the Auction that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is such Successful Bidder's proposed form of adequate assurance of future performance (each such objection, an "<u>Adequate Assurance Objection</u>"), must file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **March 12, 2025, at 4:00 p.m. (prevailing Eastern Time)**, (the "<u>Adequate Assurance Objection Deadline</u>").<br><br><u>Resolution of Adequate Assurance Objections</u>. Pursuant to the Bidding Procedures Order, the Trustee and the objecting Counterparty must first confer in good faith to attempt to resolve any Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the applicable Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the applicable Successful Bidder (or any other relevant assignee) shall be determined by the Court at the applicable Sale Hearing.<br><br><u>Failure to Timely Object</u>. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance. The applicable Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document. |

| | |
|---|---|
| **Notice of Assumed Contracts** | As soon as reasonably practicable after the closing of a Sale Transaction, the Trustee will file with the Court and serve on the applicable Counterparties a notice containing the list of Contracts that the Trustee caused the Debtor to assume and assign pursuant to any asset purchase agreement with a Successful Bidder. |
| **Reservation of Rights** | The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Trustee, any Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Trustee reserves all of his rights, claims and causes of action with respect to each Contract listed on the aforementioned notices. |

## Basis for Relief

### A. The Bidding Procedures Are Fair, Appropriate, and in the Best Interests of the Debtor's Estate and its Stakeholders

25.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Transp. Co.),* 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy estate"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (*citing Metro. Airports Comm'n v. Nw. Airlines, Inc. (In re Midway Airlines, Inc.*), 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.") (alteration in source)).

26.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy,*

*Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *see also In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . .[should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); *Off. Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

27.     The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Assets. The Trustee, therefore, believes the timeline established in the Bidding Procedures are reasonable and will in no way hinder the Trustee's ability to sufficiently market the Assets. The Trustee structured the Bidding Procedures to attract competitive and active bidding from parties with the financial capability to close on a Sale Transaction quickly and efficiently.

28.     Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g., In re New Rue21 Holdco, Inc.*, No. 24-10939 (BLS) [Docket No. 194] (Bankr. D. Del. May 23, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline five days after entry of bidding procedures order and sale hearing 28 days after the petition date); *In re Casa Sys., Inc.*, No. 24-10695 (KBO) [Docket No. 261] (Bankr. D. Del. May 2, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 22 days after entry of bidding procedures order and sale hearing 62 days after the petition date); *In re SC Healthcare Holding, LLC*, No. 24-10443 (TMH) [Docket No. 341] (Bankr. D. Del. May 21, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 33 days after entry of

bidding procedures order and sale hearing 112 days after the petition date); *In re Sientra, Inc.*, No. 24-10245 (JTD) [Docket No. 123] (Bankr. D. Del. Mar. 25, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 20 days after entry of bidding procedures order and sale hearing 42 days after the petition date); *In re Nanostring Techs., Inc.*, No. 24-10160 (CTG) [Docket No. 384] (Bankr. D. Del. Mar. 28, 2024) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 15 days after entry of bidding procedures order and sale hearing 75 days after the petition date); *In re ViewRay, Inc.*, No. 23-10935 (KBO) [Docket No. 208] (Bankr. D. Del. Aug. 23, 2023) (approving bidding procedures, with designated stalking horse protections, including bid deadline 27 days after entry of bidding procedures order and sale hearing 74 days after the petition date); *In re EYP Grp. Holdings, Inc*., No. 22-10367 (MFW) [Docket No. 81] (Bankr. D. Del. May 11, 2022) (approving bidding procedures, including bid deadline 23 days after entry of bidding procedures order and sale hearing 59 days after the petition date); *In re MobiTV, Inc.*, No. 21-10457 (LSS) [Docket No. 164] (Bankr. D. Del. Apr. 7, 2021) (approving bidding procedures, with designated stalking horse protections, including bid deadline 30 days after entry of bidding procedures order and sale hearing 81 days after the petition date); *In re Shiloh Indus., Inc.*, No. 20-12024 (LSS) [Docket No. 206] (Bankr. D. Del. Sept. 25, 2020) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 31 days after entry of bidding procedures order and sale hearing 72 days after the petition date); *In re Lucky Brand Dungarees, LLC*, No. 20-11768 (CSS) [Docket No. 251] (Bankr. D. Del July 30, 2020) (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures order and sale hearing 40 days after the petition date); *In re FTD Cos., Inc.*, No. 19-11240 (LSS) [Docket No. 201] (Bankr. D. Del. June 25, 2019) (approving bidding procedures, with procedures to

designate stalking horse bidders, including bid deadline 20 days after entry of bidding procedures order and sale hearing 59 days after the petition date).[5]

29.    Accordingly, the Bidding Procedures should be approved, not just because they are aligned with the circumstances of the Debtor's Chapter 7 Case, but also because they are consistent with procedures approved by courts in this District in cases of similarly-situated debtors.

**B.    The Designation of Stalking Horse Bidders, Including the Provision of Termination Payments, Is Necessary, Reasonable and Appropriate**

30.    Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice. In the Third Circuit, "break-up" fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate. *See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 533. *In O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee. *See id.* First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*. Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the debtor's assets." *In re Integrated Res., Inc.,* 147 B.R. at 659, *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Put differently, these bidding protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair

---

[5] The unreported orders cited herein are voluminous and not attached to this Motion. Copies of these orders will be made available upon request to the proposed counsel for the Debtors.

and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation and internal quotation marks omitted).

31.     The designation of, and provision of bidding protections to, a Stalking Horse Bidder would be reasonable and appropriate here because the Trustee only would enter into a Stalking Horse Agreement to the extent the Trustee determined, in his reasonable business judgment, that the Stalking Horse Agreement would maximize the ultimate sale price for the applicable Assets and would not have a chilling effect on competitive bidding. Indeed, the Trustee would only enter into a Stalking Horse Agreement and offer a Termination Payment to a Stalking Horse Bidder if he determined that doing so would enhance competitive bidding. Any Termination Payment would be paid out of the proceeds of an alternative transaction that generated higher or better value for the applicable Assets. Further, the Trustee will carefully negotiate the terms of any Termination Payment to ensure that the amount of such payment is commensurate with the value conferred on the estate by the Stalking Horse Bid. That approval of any Stalking Horse Agreement would be subject to the Sale Notice Parties' right to object and be heard further ensures that the corresponding Termination Payment would satisfy the standard articulated by the Third Circuit in *O'Brien*. Authority to enter into Stalking Horse Agreements and offer bidding protections to Stalking Horse Bidders affords the Trustee the necessary flexibility to direct the sale process in a manner that maximizes his ability to generate the highest or best value for the Debtor's Assets. Accordingly, there is ample justification for authorizing the Trustee to enter into one or more

Stalking Horse Agreements and to offer bidding protections in accordance with the Stalking Horse Procedures.

**C.      Approval of an Asset Sale Is Warranted Under Section 363 of the Bankruptcy Code**

32.      Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment. *See Culp v. Stanziale (In re Culp)*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Trustee] to show that a sound business purpose justifies such actions.' . . . If the bankruptcy trustee's decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (*quoting Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Off. Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp. (In re Chateaugay Corp.*), 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

33.      Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re*

*Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (*citing Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.*), 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)). As such, it follows that when a trustee demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See In re Integrated Res., Inc.*, 147 B.R. at 656 (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

1.      **The Trustee Demonstrated a Sound Business Justification for the Sale of the Assets**

34.      The first question Courts consider when evaluating whether a sale passes muster under the business judgment standard is whether sound business justification exists for the sale. *See, e.g., In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "require[ing] that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose").

35.      As set forth above, a strong business justification exists for a sale of the Debtor's Assets as described herein. An orderly but expeditious sale of the Assets is critical to preserving their value and maximizing recoveries for the Debtor's economic stakeholders.

2.      **The Sale Noticing and Objection Procedures Are Appropriate and Comply with Bankruptcy Rules 2002 and 6004**

36.      Second, the Court will consider whether adequate and reasonable notice of the sale was provided to interested parties. Bankruptcy Rules 2002 and 6004 require the Trustee to notify creditors of the proposed sale, provide a description of the Assets and disclose the time and place

of the Auction, the terms and conditions of any proposed Sale Transaction and the Objection Deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c) and 6004(a). The Sale Noticing and Objection Procedures set forth above are reasonably calculated to provide all of the Debtor's known creditors and other parties in interest with adequate and timely notice of all of the key dates, deadlines and other material information related to the sale process. Accordingly, the Trustee requests that the Court approve the Sale Noticing and Objection Procedures as set forth herein, including the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, and the Auction Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**, and find that no other or further notice of the Bidding Procedures, the Auction or the Sale Hearing is necessary or required, except for the notices expressly contemplated by the Bidding Procedures.

### 3. The Bidding Procedures are Designed to Yield a Fair and Reasonable Purchase Price for the Assets

37.     The third factor Courts consider in evaluating whether the business judgment standard is satisfied is whether the sale will produce a fair and reasonable price for the assets. As set forth above, the Trustee believes that any Sale Transaction governed by the Bidding Procedures will yield a fair and reasonable price for the Assets. The Bidding Procedures were carefully designed to facilitate a robust and competitive bidding process to maximize the value of the Assets quickly and efficiently.

38.     The Trustee also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process. The Bidding Procedures provide an appropriate framework for the Trustee to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties in interest. Further, the Bidding Procedures require the Trustee to engage with and consider the interests of the Consultation Party and its respective constituencies at nearly every

juncture. This required level of engagement among the parties will further safeguard the integrity of the sale process.

39. A Sale Transaction governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or best value for the Assets. This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in this case.

### 4. The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith

40. Finally, the Court will consider whether the parties have acted in good faith. While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Cumberland Farms Dairy, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (*other citation omitted*); *see also Kabro Assoc. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

41. As set forth above, the Bidding Procedures were designed with the goal of producing a fair and transparent sale process that will yield the highest or best value for the Assets. Any asset purchase agreement executed by the Trustee will be negotiated at arm's length and in good faith at each stage of the negotiations.

### 5. A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code

42. In the interest of attracting the best offers, the Court should authorize the Trustee to sell the Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code

authorizes a trustee to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

> (a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (b)    such entity consents;
>
> (c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)    such interest is in bona fide dispute; or
>
> (e)    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)–(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

43.    The Trustee anticipates that any Sale Transaction he elects to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets. Accordingly, the Trustee requests that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**D. Assumption and Assignment of Executory Contracts and Unexpired Leases, and the Assumption and Assignment Procedures, Are Appropriate under Section 365 of the Bankruptcy Code**

44.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment"); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned "if the decision was the product of bad faith, whim or caprice"). In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

45.     Any proposed Sale Transaction will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment. Assumption of any Contract is an exercise of the Trustee's sound business judgment because the transfer of Contracts in connection with a Sale Transaction is an essential element in the Trustee's ability to maximize the value of the Assets — and, particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired. Further, the ability to assume and assign Contracts will increase the likelihood that the Debtors will be able to sell the Assets to a strategic purchaser, thereby avoiding a liquidation of otherwise marketable operating assets and facilitating the preservation of as many jobs as possible.

46.     The consummation of any Sale Transaction involving the assignment of a Contract will be contingent upon the Trustee's compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) requires that any outstanding defaults under the Contracts to be assumed be cured or that the Trustee provide adequate assurance that such defaults will be promptly cured. *See* 11 U.S.C. § 365(b)(1). Assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of an applicable Sale Transaction. As set forth above, subject to the Court's approval, the Trustee will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Trustee's good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale Transaction. Counterparties will have an opportunity to raise any Cure Objections in advance of the applicable Sale Hearing.

47.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). While the Bankruptcy Code does not define "adequate assurance," courts have held that "adequate assurance of future performance" are not words of art, and should be given a practical, pragmatic construction and "must be determined by consideration of the facts of the proposed assumption." *See In re Fleming Cos*., 499 F.3d 300, 307 (3d Cir. 2007) (citation and internal quotation marks omitted); *see also In re Alipat, Inc*., 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations") (citations omitted). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *Carlisle Homes,*

*Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citations omitted); *see also In re Natco Indus., Inc*., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

48.      Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc*., 56 B.R. at 605-06 (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

49.      The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid. The Trustee will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following their receipt of such information. Any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Trustee and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearings.

50.      The Assumption and Assignment Procedures also require the Trustee to provide notice to Counterparties to any Contracts that are, after service of the applicable Notice of Auction Results, designated by a Successful Bidder for assumption and assignment or as an excluded asset pursuant to the terms of the asset purchase agreement governing the applicable Successful Bid. Accordingly, because the Assumption and Assignment Procedures are carefully designed to ensure

that Counterparties receive timely and sufficient notice with respect to the disposition of their Contracts at each phase of the sale process, the Trustee respectfully request that the Court approve the Assumption and Assignment Procedures. In light of the foregoing, the assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

51.     Finally, in order to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Trustee further request that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[6]

## E.     Requests for Immediate Relief & Waiver of Stay

52.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Trustee seeks a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order and any other order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale Transaction. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease

---

[6] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

53.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's Assets for the benefit of the Debtor's stakeholders. Accordingly, the Trustee submits that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## Consent to Jurisdiction

54.    Pursuant to Local Rule 9013-1(f), the Trustee consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

55.    Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the Debtor; (iii) counsel to the Consultation Party; (iv) the Interested Parties and any other known party that has expressed an interest in purchasing the Debtor's Assets; (v) all creditors who have filed proofs of claim in this Chapter 7 Case as of the date of this Motion to Expedite; and (vi) those persons who have requested notice pursuant to Fed. R. Bankr. P. 2002.

## No Prior Request

56.    No prior request for the relief sought herein has been made to this Court or any other court in connection with this Chapter 7 Cases.

*[Signature Page to Follow]*

WHEREFORE, the Trustee respectfully requests that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) at the Sale hearing, enter one or more Sale Orders, as applicable, substantially in the form attached hereto as **Exhibit B**, authorizing one or more sales of the Assets free and clear of all liens, claims, interests and encumbrances to the fullest extent permitted by section 363(f) of the Bankruptcy Code and (iii) grant such other and further relief to the Trustee as the Court may deem proper.

Dated: February 5, 2025.

**FOX ROTHSCHILD LLP**

By: */s/ Stephanie Slater Ward*
Stephanie Slater Ward (DE No. 6922)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Phone (302) 654-7444/Fax (302) 656-8920
sward@foxrothschild.com

-and-

Michael G. Menkowitz, Esquire
Jesse M. Harris, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Phone (215) 299-2000/Fax (215) 299-2150
mmenkowitz@foxrothschild.com
jesseharris@foxrothschild.com

*Counsel for Alfred T. Giuliano,*
*Chapter 7 Trustee for the estate of Joriki USA Inc*