**Exhibit 1**

**<u>Asset Purchase Agreement</u>**

## ASSET PURCHASE AGREEMENT

Asset Purchase Agreement (this "*Agreement*") is made this 12th day of March, 2025 (the "*Effective Date*"), by and between Alfred T. Giuliano, solely in his capacity as Chapter 7 Trustee ("*Seller*") for the estate of Joriki USA Inc., a Delaware corporation ("*Debtor*") and Long Way USA Corporation, a Delaware corporation or its designated assignee (hereinafter "*Buyer*").

## RECITALS

**WHEREAS**, Debtor is in the business of providing co-packing services to beverage companies (the "*Business*") from its Pittston, Pennsylvania production facility (the "*PA Facility*");

**WHEREAS**, Debtor filed a voluntary petition for relief under Chapter 7, Title 11, United States Code, as amended (the "*Bankruptcy Code*") on January 12, 2025 (the "*Petition Date*") in the United States Bankruptcy Court, District of Delaware (the "*Bankruptcy Court*"), Case Number 25-10034 (the "*Bankruptcy Case*");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver the Acquired Assets (as hereinafter defined), and Buyer desires to purchase, take delivery of and acquire such Acquired Assets, and to assume such Assumed Liabilities, in each case on an "AS IS, WHERE IS" basis, except for the representations and warranties expressly set forth in Section 10 below and upon the terms and subject to the conditions set forth herein;

**WHEREAS**, the transactions contemplated by this Agreement (the "*Transactions*") will be consummated in accordance with Sections 105(a), 363, 365 and other applicable provisions of the Bankruptcy Code and pursuant to authorization to be granted by the Bankruptcy Court (the "*Sale*"), as provided in the final sale order entered by the Bankruptcy Court (the "*Sale Order*");

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual representations, warranties, covenants and promises contained herein, the adequacy and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.    **Purchase of Acquired Assets.**  Subject to the terms and conditions of this Agreement and the Sale Order, at the Closing (as defined herein), Buyer shall purchase, and Seller shall sell all right, title and interest of Seller in and to the Acquired Assets free and clear of all liens, encumbrances, claims, security interests and the like.  "*Acquired Assets*" acquired hereunder shall mean all of the assets, properties, goodwill, rights and claims of Seller set forth on Schedule 1 attached hereto that Seller has title to.  The Acquired Assets shall not include the Excluded Assets. The term "*Excluded Assets*" means any and all assets of the Debtor other than the Acquired Assets, including, without limitation, the following:

        (a)    accounts receivable and other rights to payment (including notes receivable) of the Debtor and Seller, and all proceeds therefrom (whether on account of principal, interest, proceeds from disposition of collateral or otherwise) as of the Closing Date;

(b)     Certificates of Incorporation, bylaws, seals, stock books, minute books, stock ledgers, and other documents relating solely to the organization, maintenance and existence of the Debtor as a corporation;

(c)     any legal or beneficial interests in the shares of the Debtor or Seller or in equity that Debtor or Seller owns;

(d)     all cash, cash equivalents and short-term investments as of the Closing Date, and all rights to receive and retain the lease deposit under that certain Lease Agreement for the PA Facility dated December 23, 2021, between Joriki USA, Inc. and 575 Research Drive, LLC ("*Lease Deposit*");

(e)     all claims or causes of action relating to the Debtor or Seller and its bankruptcy estate, including actions under Chapter 5 of the Bankruptcy Code;

(f)     any (i) books and records that Debtor or Seller is required by law to retain, provided that Buyer shall receive a copy thereof; (ii) duplicate copies of any records as are necessary to enable Debtor or Seller to file tax returns and reports; and (iii) any books and records relating to the organization, ownership, existence or corporate record keeping of the Debtor or Seller;

(g)     any insurance policies or rights to proceeds thereof, including, without limitation, D&O claims, relating to the assets, properties, business or operations of Debtor or Seller and the PA Facility;

(h)     all assets and rights of the Debtor in and with respect to the employee benefit plans;

(i)     all tax losses and tax loss carry forwards of the Debtor or Seller and rights to receive refunds, credits and credit carry forwards with respect to any taxes of the Debtor or Seller

(j)     all rights of the Debtor or Seller under this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement (the "*Transaction Documents*").

2.     **Closing**.  Title to all of the Acquired Assets shall pass to Buyer upon the closing of the transaction (the "*Closing*"), which shall occur on the fifteenth (15th) day after the entry of Sale Order, or such earlier date after entry of the Sale Order as the Buyer may request if Buyer elects to waive the appeal period in its sole and absolute discretion, or such other date as the parties hereto may agree to in writing (the "*Closing Date*"), provided all conditions contained in Section 8 hereof have been met.  Seller recognizes and acknowledges that the value of the Acquired Assets is subject to diminution.  As such, time is of the essence to the Closing on the transactions contemplated by this Agreement.

3.     **As is, Where is**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPLICITLY PROVIDED IN THIS AGREEMENT, THE ACQUIRED ASSETS

ARE BEING SOLD AND TRANSFERRED TO BUYER "AS IS, WHERE IS", AND SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATED TO THE ACQUIRED ASSETS. WITHOUT LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER SHALL CONDUCT AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.

4.     **Buyer Agreements**. Upon the terms and subject to the conditions of this Agreement, Buyer agrees:

(a)     Effective at the Closing, to assume only the following liabilities of Seller, in each case, except to the extent any of such liabilities are Excluded Liabilities (as defined herein) (the "***Assumed Liabilities***"):

(i)     all liabilities arising under the Assumed Contracts after the Closing Date but not including claims, debts, liabilities or demands arising, occurring or accruing from the Debtors or Trustee's actions or inactions prior to the assumption, but such assumption shall not include any indemnity claims, percentage rent or year- end true ups relating to actions or omissions of the Debtor or Trustee that occurred prior to the assumption of the Assumed Contracts.

(b)     Notwithstanding any other provision of this Agreement, Buyer shall not assume or be liable for any liabilities of Seller or Debtor, of any kind (whether or not asserted, accrued, contingent, at law or in equity or otherwise (including any liability based on successor liability theories), scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim billed in the Bankruptcy Cases, secured, unsecured, priority or administrative), other than the Assumed Liabilities (the "***Excluded Liabilities***"). For avoidance of doubt, the term "Excluded Liabilities" shall include all of the Cure Costs relating to the Assumed Contracts. The term "***Cure Costs***" means all amounts that must be paid and all obligations that otherwise must be paid or satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code to cure any defaults under any of the Assumed Contracts in connection with the assumption thereof by, and/or assignment thereof to, Buyer. The Seller pay all Cure Costs relating to the Assumed Contracts to the respective counterparties concurrently with the Closing hereunder, subject to the provisions of Section 8(m) of this Agreement.

(c)     To the maximum extent permitted by the Bankruptcy Code, the executory contracts and unexpired leases of Seller not previously rejected pursuant to

Section 365 of the Bankruptcy Code that are specifically listed on <u>Schedule 2</u> (collectively, the "***Assumed Contracts***") shall be assumed by Seller and assigned to Buyer at Closing pursuant to Section 365 of the Bankruptcy Code; provided, however, that that Buyer may, in its sole discretion, add to the Assumed Contracts on <u>Schedule 2</u> or delete one or more of the Assumed Contracts from <u>Schedule 2</u> at any time prior to the Closing.  If any such assignment of an Assumed Contract is not effectuated pursuant to the Sale Order, Seller shall, at the request of Buyer, seek an Order (as hereinafter defined) from the Bankruptcy Court after the Closing Date to assign such Assumed Contract to Buyer. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Seller and Buyer, to the extent that such consent shall not have been given prior to the Closing; provided, however, that Seller shall use, whether before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof. The term "Order" means any award, decision, decree, order, directive, injunction, judgment or consent of or entered, issued, made or rendered by the Bankruptcy Court.

(d)     Buyer reserves the right, exercisable in its sole discretion by way of a written proposal to such employee or contractor, to offer future employment to any of the Debtor's employees and contractors on terms and conditions acceptable to Buyer.

5.     **Exclusions**. For the avoidance of doubt, Seller shall retain all rights to its receivables as of the Closing Date. Seller shall also retain all Bankruptcy Code Chapter 5 causes of action and all other Excluded Assets.  Regarding these pre-Closing receivables, Buyer and Seller hereby recognize and acknowledge that the origin of these receivables is the customer contracts. As such, Seller reserves the right to collect such receivables in a reasonable fashion after Closing so long as the actions taken by Seller do not cause any interruption or interference with the business relationship of such customer with the Buyer post-Closing and in no event shall Seller commence any legal action to collect such receivable without the prior written consent of Buyer, which consent shall not be unreasonably withheld; provided, however, that in the event Seller proposes to commence a legal action against a customer of the Buyer to recover any account receivable constituting an Excluded Asset, Buyer may withhold its consent and the withholding of such consent in that situation shall be deemed reasonable.

6.     **Purchase Price; Allocation of Purchase Price**.  The purchase price shall be an aggregate amount up to Nine Million Dollars ($9,000,000) ("***Purchase Price***"), payable as follows:  (i) an Nine Hundred Thousand Dollar ($900,000) earnest money deposit payable upon the execution of this Agreement (the "***Deposit***"); and (ii) payment of an amount equal to the difference between (A) the Purchase Price, and (B) the amount of the Deposit (such difference being referred to herein as the "***Closing Payable***") at the Closing in immediately payable funds. The Purchase Price shall be allocated amongst the Acquired Assets as follows: (A) $500,000 to

leasehold improvements at the PA Facility and (B) the balance to installed machinery and/or equipment at the PA Facility.

7. **Deposit**.

(a)    Buyer has provided the Deposit in good faith to Seller.

(b)    The Deposit shall be promptly returned by Seller to Buyer (i) if the Trustee rejects this Agreement as being a non-qualified bid or (ii) if the Closing does not occur by reason of the failure of any of the conditions to Closing set forth in Section 8 of this Agreement or as required in Section 12(a)(ii) or (iii) if the Buyer is not the highest and best offer received by the Trustee at any Auction.

(c)    If Seller breaches any of the terms, covenants or conditions of this Agreement prior to Closing (and Buyer shall not be in material default hereunder), after Buyer has given Seller not less than ten (10) days written notice of such default and if such default remains uncured after such notice period, or if any representation of Seller contained in this Agreement shall be materially false or misleading, Seller shall return the Deposit to Buyer within five (5) business days thereafter.

(d)    In the event Closing does not occur by the "End Date" (as defined in Section 12(a)(ii) below) by reason of a Buyer Default (defined below), then Seller shall retain the Deposit as liquidated damages and Seller shall not have any other right or remedy, either in equity or at law, against Buyer arising out of or in any way connected with such Buyer Default, including any right to commence a specific performance action against Buyer, all of which such other rights and remedies and claims are hereby waived by Seller.  It shall be a default by Buyer under this Agreement (a "*Buyer's Default*") if any one or more of the following shall occur: (i) Buyer shall fail to pay the Closing Payable when due at Closing; or (ii) Buyer shall have made any material misrepresentation or material breach of warranty, or shall have failed to perform any of its other material covenants and material agreements contained in this Agreement when required to be performed hereunder which misrepresentation, breach or failure shall result in Buyer's inability or unwillingness to complete the Closing on the terms and conditions set forth herein, and such misrepresentation, breach or failure shall continue for ten (10) days after Seller gives Buyer written notice of such misrepresentation, breach or failure; it being agreed that if a failure to perform occurs within ten (10) days prior to or on the Closing Date, the Closing Date shall be extended for no more than ten (10) days from the date of Buyer's Default as required to allow the cure to occur before Closing.

8.    **Closing Conditions**. The asset purchase and sale contemplated by this Agreement is expressly subject to each of the following conditions:

(a)     The execution and delivery of a signed copy of this Agreement by Buyer, Debtor and Seller.

(b)     The representations and warranties of Seller contained in Section 10 of this Agreement that are qualified as to materiality or material adverse effect shall be true and correct, and the representations and warranties of Seller, on behalf of the Debtor, contained in this Agreement that are not so qualified shall be true and correct in all material respects, in each case as of the date of this Agreement and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date; provided, however, Buyer understands and acknowledges that this purchase and sale is made on an "as is" "where is" basis, subject to the representations in Section 10.

(c)     No temporary restraining order, preliminary or permanent injunction or other judgment or order issued by any court of competent jurisdiction or other statute, law, rule, legal restraint or prohibition (collectively, "***Restraints***") shall be in effect enjoining, restraining, prohibiting or preventing the consummation of the Sale or otherwise making the consummation of the Sale illegal.

(d)     The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Buyer, and which shall be a Final Order, unless Buyer has elected to waive the appeal period pursuant to Section 2 of this Agreement. The term "***Final Order***" means any order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state, commonwealth, or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended in any manner that is materially adverse to Buyer and as to which (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken on granted. Notwithstanding the foregoing, nothing in this Agreement shall preclude Buyer from consummating the Transactions contemplated herein if Buyer, in its sole and absolute discretion, waives the requirement that the Sale Order shall have become a Final Order. No notice of such waiver of this or any other condition to the Closing need be given except to Seller, it being the intention of the parties hereto that Buyer shall be entitled to, and is not waiving, the protections of Bankruptcy Code Section 363(m), the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Order being a Final Order.

(e)    Buyer and Seller shall have received all necessary regulatory and governmental approvals with respect to the Sale and the Transactions contemplated hereunder and all waiting periods applicable to such approvals shall have expired.

(f)    Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, including, without limitation, the payment by Seller of all Cure Costs relating to the Assumed Contracts to the counterparties thereto.

(g)    There shall not be any pending or threatened litigation that could reasonably be expected to result in any Restraint having any of the effects set forth in Section 8(c).

(h)    Compliance with all terms and conditions contained herein and approval by the Bankruptcy Court.

(i)    Delivery of all required documents set forth in Sections 8 and 9.

(j)    No finders' fee, broker or other fee shall be payable by Buyer.

(k)    As a condition to Closing in favor of Buyer, the Lease Agreement for the Pittston PA Facility identified as item 1 in <u>Schedule 2</u> must be included as one of the Assumed Contracts.

(l)    All equipment, machinery, spare parts, construction in process and IT equipment listed in the Schedules attached to this Agreement shall be located at the Pittston PA Facility on the date of the Closing hereunder.

(m)    Prior to Closing, 575 Research Drive, LLC ( "Landlord"), the landlord under the Lease Agreement for the Pittston PA premises ("Lease") shall have agreed in writing, in form and substance reasonably acceptable to Buyer and Seller, (which writing may include a provision in the Sale Order consented to by the Landlord, Buyer and Seller), to accept the sum of $0 from the Trustee and otherwise relieve Trustee of its obligation to pay the Landlord's Asserted Cure Costs in the amount of $1,300,000 ( all as defined in the form of Sale Order attached hereto) for the sole purpose of payment of the cure amounts necessary for the Trustee to assume and assign the Lease to Buyer at the  Closing as required under Section 365 of the Code ("Section 365 Cure Amount"); provided, further that the Sale Order shall make a finding that the Buyer and the Landlord shall be deemed to have agreed that the Section 365 Cure Amount shall not impair or reduce or effect the terms and conditions and the consideration being provided by the Buyer to the Landlord under their agreement to amend the Lease effective as of, or after the Closing (the "Amended Lease"), which Amended Lease shall control.

9.    **<u>Closing Deliveries</u>**. At Closing, Seller shall deliver to Buyer:

(a)    Bill of Sale and Assignment and Assumption Agreement to be prepared by Buyer; and

(b)    Bankruptcy Court Order approving this Agreement.

10.    **Seller Representations**. Seller represents and warrants to Buyer as follows:

(a)    Except for such authorization as is required by the Bankruptcy Court, Seller is the duly appointed Chapter 7 Trustee for the Debtor.

(b)    Seller has, or will have upon entry of the Sale Order, the unrestricted power and right to sell, assign and deliver all Acquired Assets free and clear of all claims, liens, and encumbrances of whatever nature. Subject to the Sale Order, at the Closing, Buyer will obtain title to the Acquired Assets free and clear of all claims, liens, and encumbrances of whatever nature. The property included in the Acquired Assets will be sold to Buyer at the Closing in its "as is" "where is" condition.

(c)    Seller has not authorized any person to act as broker, finder, banker, consultant, intermediary or in any other similar capacity that would entitle such person to any investment banking, brokerage, finder's or similar fee payable by Buyer in connection with the Transactions contemplated by this Agreement or any of the other Transaction Documents.

11.    **Buyer Representations**. Buyer represents to Seller that:

(a)    Buyer is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware. Buyer has full power and authority to enter into and perform this Agreement.

(b)    The execution and performance of this Agreement by Buyer will not (i) result in a material breach of, or constitute a material default under, any order, judgment, or decree or any agreement or other instrument to which Buyer is a party or by which Buyer may be bound or (ii) constitute a violation of any law or regulation or enforcement of which would have a material adverse effect on Buyer's ability to perform its obligations under this Agreement. The execution and performance of this Agreement by Buyer has been duly authorized by all necessary corporate action of Buyer and this Agreement constitutes the valid and binding obligation of Buyer enforceable against in accordance with its terms.

(c)    There are no judicial or administrative actions, proceedings, or investigations pending or threatened that question the validity of this Agreement or any action taken or to be taken by Buyer in connection with this Agreement that, if adversely determined, would have a material adverse effect on Buyer's ability to perform its obligations under this Agreement.

12.    **Termination**.

    (a)    <u>Grounds for Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

        (i)    by mutual written agreement of Seller and Buyer;

        (ii)    by Seller or Buyer, if the Closing shall not have been consummated on or before March 31, 2025 or such other later date as the parties here to may agree to in writing (the "***End Date***"), unless the party seeking termination is in material breach of its obligations hereunder;

        (iii)    by Seller or Buyer, if any condition set forth in Sections 8(a) through (j) is not satisfied by the Closing, and such condition is incapable of being satisfied by the End Date;

        (iv)    by Buyer, if the condition set forth in Section 8(k) is not satisfied by the Closing;

        (v)    by Seller or Buyer, if (i) Seller executes a definitive agreement with a third party (other than Buyer) for the acquisition of all or substantially all the Acquired Assets ("***Successful Bid***"), and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.  Buyer agrees that it will serve as a back-up bidder, subject to the terms and conditions of this Agreement, if Buyer's bid pursuant to this Agreement is selected by the Bankruptcy Court as the next highest and best bid after the Successful Bid.

The party desiring to terminate this Agreement pursuant to this Section 12(a) (other than pursuant to Section 12(a)(i)) shall give notice of such termination to the other party in accordance with Section 14.

    (b)    <u>Effect of Termination</u>. If this Agreement is terminated as permitted by Section 12(a), such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party to this Agreement.

    (c)    <u>Fees and Expenses</u>.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such cost or expense.

13.    **Notices**. All notices required or permitted to be given by any party shall be in writing and shall be deemed to have been properly given if sent by registered or certified mail, or by recognized overnight courier service (the "***Courier Service***"), postage prepaid, to the parties at the addresses set forth below or to such other address as any party may from time to time give notice pursuant to this section. All notices shall be deemed received when delivered but in no event

later than five (5) business days after they are deposited with either the United States Postal Service or the Courier Service, whichever shall first occur. Notice shall be given at the following addresses:

To Buyer:

Long Way USA Corporation
19800 MacArthur Blvd, Ste 1000
Irvine, CA 92612
Attn:  Xia Zhang, U.S. Representative
Email: zhangxin205@yahoo.com

With a copy to:

Blank Rome LLP
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Attention: Stanley B. Tarr, Joel C. Shapiro
Email: stanley.tarr@blankrome.com; joel.shapiro@blankrome.com

To Seller:

Alfred T. Giuliano, Chapter 7 Trustee

Giuliano, Miller & Co., LLC
2301 E. Evesham Road
Pavilion 800, Suite 210
Voorhees, NJ  08043

With a copy to:

Michael G. Menkowitz, Esquire
Jesse M. Harris, Esquire
Fox Rothschild, LLP
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, PA 19107

14.    **No Transition Services Agreement; Access to Books and Records**.    It is understood that Buyer is not requesting in this Agreement any transition services agreement or other formal arrangements from Seller with respect to the ownership and operation of the Acquired Assets after the Closing.  Buyer does request, and Seller hereby agrees to provide, reasonable access to all of the Debtor's books and records relating to the Acquired Assets for a reasonable period of time after the Closing.

15.    **Entire Agreement; Effect of this Agreement**. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, if any, with respect to the matters covered hereby.  This

Agreement supersedes and replaces in its entirety the form of Asset Purchase Agreement, dated March 3, 2025 that was executed by Buyer, as amended from time to time.

16.     **Miscellaneous**. This Agreement may not be changed, modified or amended except by writing signed by each party hereto. Except as to subsidiaries and successors of any party to this Agreement, this Agreement shall not be assigned or otherwise transferred by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. This Agreement shall be binding upon and inure to the benefit of the successors, subsidiaries, affiliates and permitted assigns of the parties. This Agreement shall be governed by and construed in accordance with the laws of the state of Delaware and the Bankruptcy Court shall retain jurisdiction over this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date first written above.

SELLER:

WITNESS/ATTEST:                      ALFRED T. GIULIANO,
                                     CHAPTER 7 TRUSTEE FOR
                                     JORIKI HOLDINGS, INC.


_____     By: _____(SEAL)
                                         Alfred T. Giuliano, Chapter 7 Trustee



                                     BUYER:

WITNESS/ATTEST:                      LONG WAY USA CORPORATION
                                     19800 MacArthur Blvd, Ste 1000
                                     Irvine, CA 92612
                                     Attn:  Xia Zhang, U.S. Representative
                                     Email: zhangxin205@yahoo.com


_____     By: _____(SEAL)


*[Signature page to Asset Purchase Agreement]*

12

**Schedule 1**

**Acquired Assets**

This Schedule 1 forms a part of the within Asset Purchase Agreement and, unless otherwise defined in this Schedule 1, all capitalized terms used in this Schedule 1 shall have the meanings ascribed to them in such Asset Purchase Agreement.

The term "*Acquired Assets*" shall mean all of the assets, properties, goodwill, rights and claims of Seller relating to the Business other than the Excluded Assets, including, but not limited to, the following:

     (a)    all rights of Seller under the Assumed Contracts set forth in Schedule 2, after giving effect to the right of Buyer to make additions or deletions to the Assumed Contracts referred to in <u>Schedule 2</u> prior to the Closing;

     (b)    all credit for pre-paid expenses, advance payments, prepayments, and security deposits (excluding the Lease Deposit provided to the landlord of the PA Facility) under the Assumed Contracts;

     (c)    all inventory, raw materials and work-in-process related to the Business;

     (d)    all equipment, machinery, spare parts, construction in process, IT equipment, office equipment, fixtures and other tangible personal property used or usable in the Business located in the PA Facility (collectively, the "*Equipment and Personal Property*"), including, without limitation, the equipment, machinery, office equipment and other tangible person property set forth on <u>Schedule 1-A</u> attached hereto;

     (e)    the "Intellectual Property" defined and described on <u>Schedule 1-B</u> attached hereto;

     (f)    all general intangibles and goodwill associated with the Business, including Seller's relationships with their customers, and all of Seller's customer lists;

     (g)    all telephone and facsimile numbers of the Business and all records of email addresses of customers and suppliers of the Business;

     (h)    all data and records related to the Business, including client and customer lists, prospect lists, supplier lists, and records, referral sources, research and development reports and records, production reports and records, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records and, subject to applicable law, and copies of all personnel records; and

(i)     subject to obtaining the applicable consents, all permits and licenses held by Sellers relating to the Business, but only to the extent such permits and licenses may be transferred under applicable law.

## Schedule 1-A

**Equipment and Personal Property**

[Voluminous – Available Upon Request]

## Schedule 1-B

### Intellectual Property

"Intellectual Property" means all intellectual property rights of Seller relating to the Business and/or used by Seller in connection with its ownership and operation of the Business throughout the world, including all U.S. and foreign rights in (a) trade names, trademarks and service marks, domain names, trade dress, logos, slogans, design rights and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing; (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof; (c) copyrights and copyrightable subject matter (whether registered or unregistered); (d) proprietary rights in computer programs (whether in source code, object code, or other form), firmware, software, algorithms, and databases; (e) confidential and proprietary information, trade secrets and know-how, and all other proprietary rights in inventions, proprietary processes, formulae, models, and methodologies relating to the Business or used by Seller in the conduct of the Business; (f) all of Seller's rights and interests in telephone numbers and listings, fax listings, e-mail listings, domain names, internet addresses, website registrations, and any other such directories relating to the Business; (g) all applications and registrations for any of the foregoing; and (h) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

<u>**Schedule 2**</u>

**Assumed Contracts**

## Schedule 2
## (Contracts and Leases)

| Item No. | Counterparty | Counterparty Address | Description | Date of Agreement |
|---|---|---|---|---|
| 1 | 575 Research Drive, LLC | C/o Mericle Commercial Real Estate Services, 100 Baltimore Drive, East Mountain Corporate Center, Wilkes-Barre, PA 18702 | Lease Agreement | 12/23/2021 |
| 3 | Califia Farms | 1019 E 4th Place, Los Angeles, CA 90013 | Master Agreement for Contract manufacturing and Packaging Services | 01/01/2024 |
| 7 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 02/20/2023 |
| 8 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 04/10/2023 |
| 9 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 04/25/2023 |
| 10 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 07/24/2023 |
| 11 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 09/13/2023 |
| 12 | Domino Amjet, Inc. | 3809 Collection Center Drive, Chicago, IL 60693 | Equipment Lease | 11/28/2023 |
| 15 | FHG Companies, LLC About Time Snow | 45 Buck Road, Huntingdon Valley, PA 19006 | Services Agreement | |
| 18 | Mericle Commercial Real Estate Services | 100 Baltimore Drive, East Mountain Corporate Center, Wilkes-Barre, PA 18702 | Lease Agreement | |
| 21 | Sharpe Concepts, LLC | Attn: Jay Raval, 2850 Cinnamon Bay Circle, Naples, FL 34119 | Software License and Lease Addendum for LilyPad Applications | |
| 24 | Tetra Pak Inc. | 3300 Airport Road, Denton, TX 76207 | Master Agreement Services | 04/01/2024 |
| 26 | Xerox Financial Services | 201 Merritt 7, Norwalk, CT 06851 | Printer Lease Agreement | |
| 27 | Xylem | Attn: Daniel Axelrod, 347 Pulaski Highway, Goshen, NY 10924 | Equipment Lease | 10/21/2024 |